**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH A. PAKOOTAS, an
individual and enrolled member
of the Confederated Tribes of the
Colville Reservation; DONALD R.
MICHEL, an individual and
enrolled member of the
Confederated Tribes of the
Colville Reservation;
CONFEDERATED TRIBES OF THE
COLVILLE RESERVATION,
    *Plaintiffs-Appellees*,

STATE OF WASHINGTON,
 *Intervenor-Plaintiff-Appellee*,

v.

TECK COMINCO METALS, LTD., a
Canadian corporation,
    *Defendant-Appellant.*

No. 15-35228

D.C. No.
2:04-cv-00256-LRS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted April 6, 2016
Seattle, Washington

Filed July 27, 2016

Before:  Michael Daly Hawkins, Johnnie B. Rawlinson,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Hawkins

## SUMMARY[*]

### Environmental Law

The panel reversed the district court's denial of a smelter owner-operator's motion to dismiss claims brought against it under the Comprehensive Environmental Response, Compensation, and Liability Act.

The panel held that the owner-operator could not be said to have arranged for the "disposal" of hazardous substances that were emitted by the smelter into the air, and contaminated land and water downwind.  The owner-operator therefore could not be held liable for cleanup costs and natural resource damages under 42 U.S.C. § 9607(a)(3).  The panel found persuasive *Center for Community Action & Environmental Justice v. BNSF Railway Co.*, 764 F.3d 1019 (9th Cir. 2014), which held that emitting diesel particulate matter into the air and allowing it to be "transported by wind and air currents onto the land and water" did not constitute "disposal" of waste within the meaning of the Resource Conservation and Recovery Act.  In addition, the panel was

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

bound by the interpretation of the terms "deposit" and "disposal" in *Carson Harbor Vill Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) (en banc) (addressing former owner liability under § 9607(a)(2), rather than arranger liability under § 9607(a)(3)).

The panel remanded the case to the district court for the processing of plaintiffs' remaining claims.

## COUNSEL

Kevin M. Fong (argued), Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California; Christopher J. McNevin, Pillsbury Winthrop Shaw Pittman LLP, Austin, Texas; for Defendant-Appellant.

Paul J. Dayton (argued) and Brian S. Epley, Short Cressman & Burgess PLLC, Seattle, Washington, for Plaintiffs-Appellees.

Andrew A. Fitz (argued), Senior Counsel; Robert W. Ferguson, Attorney General of Washington; Washington State Attorney General's Office, Olympia, Washington, for Intervenor-Plaintiff-Appellee.

Harold G. Bailey, Jr., Eldon V. C. Greenberg, and Richard A. Wegman; Garvey Schubert Barer, P.C., Washington, D.C.; Malcolm Seymour III, New York, New York; Matthew Begbie and Dean Sherratt, Department of Foreign Affairs, Trade and Development, Ottawa, Ontario, Canada; for Amicus Curiae Government of Canada.

William M. Jay, Michael S. Giannotto and Andrew Kim, Goodwin Procter LLP, Washington, D.C.; Jaime A. Santos, Goodwin Procter LLP, Boston, Massachusetts; Leslie A. Hulse, American Chemistry Council, Washington, D.C.; Tawny A. Bridgeford, National Mining Association, Washington, D.C.; Steven P. Lehotsky and Sheldon B. Gilbert, U.S. Chamber Litigation Center, Washington, D.C.; Quentin Riegel, Manufacturers' Center for Legal Action, Washington, D.C.; for Amici Curiae National Mining Association, Chamber of Commerce of the United States of America, National Association of Manufacturers and American Chemistry Council.

David S. Gualtieri (argued); John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for Amicus Curiae United States of America.

Kamala D. Harris, Attorney General of California; Sally Magnani, Senior Assistant Attorney General; Margarita Padilla, Supervising Deputy Attorney General; Timothy E. Sullivan and Dennis L. Beck, Jr., Deputy Attorneys General; Office of the California Attorney General, Sacramento, California; for Amicus Curiae California Department of Toxic Substances Control.

## OPINION

HAWKINS, Circuit Judge:

When a smelter emits lead, arsenic, cadmium, and mercury compounds through a smokestack and those compounds contaminate land or water downwind, can the owner-operator of the smelter be held liable for cleanup costs and natural resource damages under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(3)? All parties agree the answer turns on whether the smelter owner-operator can be said to have arranged for the "disposal" of those hazardous substances within the meaning of CERCLA. Bound by a previous en banc case's interpretation of "deposit"—the only theory of "disposal" urged by Plaintiffs in this interlocutory appeal—as not including the gradual spread of contaminants without human intervention, we must answer no.

## I. Background

The history of legal disputes over damage caused in the State of Washington by emissions of toxic chemicals from Defendant Teck Cominco Metals, Ltd.'s ("Teck's") smelter, located ten miles north of the U.S.-Canada border in Trail, British Columbia, stretches back almost 100 years.[1] The emissions-based claim in this lawsuit is only the latest chapter in the saga.

---

[1] *See* Michael J. Robinson-Dorn, *The Trail Smelter: Is What's Past Prologue? EPA Blazes a New Trail for CERCLA*, 14 N.Y.U. Envtl. L.J. 233 (2006).

This particular lawsuit initially focused on a different form of waste disposal: Teck's dumping of slag into the Columbia River. The early procedural history of the "river pathway" claims in this lawsuit was recounted in prior appeals and is not repeated here. *Pakootas v. Teck Cominco Metals, Ltd.*, 646 F.3d 1214, 1216 (9th Cir. 2011) ("*Pakootas II*"); *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1069–71 (9th Cir. 2006) ("*Pakootas I*"). Since our last published opinion in this case, some issues relevant to the river pathway claims have proceeded to trial in the district court ("Phase I"),[2] while other issues remain to be tried.

While Phase I was ongoing, Plaintiff the Confederated Tribes of the Colville Reservation and Plaintiff-Intervenor the State of Washington (collectively, "Plaintiffs") sought leave to file a third amended complaint to add a new CERCLA claim, alleging that, in addition to dumping hazardous substances into the river, Teck also emitted hazardous substances into the air. Those substances were carried by air currents to the Upper Columbia River Site ("UCR Site"), including "upland" areas of the UCR Site.[3] The district court

---

[2] At the Phase I trial, Teck stipulated that it had dumped slag into the Columbia River in Canada, that some of the slag came to be located in the United States, where it has leached and continues to leach hazardous substances into the water and sediment of the Columbia River and Lake Roosevelt in the United States, causing the Tribes and the State to incur at least $1 each in response costs. After the Phase I trial, the district court found Teck liable as an "arranger" because it had intentionally disposed of waste into the Columbia River knowing that at least some of it would flow across the border.

[3] The UCR Site is the "areal extent of contamination in the United States associated with the Upper Columbia River." *Pakootas I*, 452 F.3d at 1069 n.3. The air pathway and injury to the upland areas of the UCR Site had

initially denied the motion as untimely. However, after the Phase I trial was completed, the district court changed its position and allowed Plaintiffs to amend their complaints to add claims for cost recovery and natural resource damages resulting from Teck's aerial emissions.

Plaintiffs' fourth amended complaints allege:

> From approximately 1906 to the present time, Teck Cominco emitted certain hazardous substances, including, but not limited to, lead compounds, arsenic compounds, cadmium compounds and mercury compounds into the atmosphere through the stacks at the Cominco Smelter. The hazardous substances, discharged into the atmosphere by the Cominco Smelter travelled through the air into the United States resulting in the deposition of airborne hazardous substances into the Upper Columbia River Site.

The environmental impact of the air emissions are described thus:

> Over time significant volumes of Teck Cominco's slag, liquid waste and air emissions, and the hazardous substances contained therein, have come to be located in, and cause continuing impacts to, the surface water and ground water, sediments, upland

---

apparently become a focus of Teck's remedial investigation/feasibility study for the Environmental Protection Agency.

areas, and biological resources which comprise the Upper Columbia River Site.

. . . .

Evidence shows that the physical and chemical decay of slag, the settling of metals associated with liquid waste, the deposition of air emissions, and the subsequent release of elements including, but not limited to, arsenic, cadmium, copper, zinc, and lead, is an ongoing process in the buried slag, sediment and soils of the Upper Columbia River Site.

. . . .

Humans are exposed to slag and contaminated sediment by direct contact with slag on the beaches of the Upper Columbia River and Lake Roosevelt, contact with contaminated sediment during low draw down periods, inhalation of airborne particles, dermal contact, and ingestion. In addition, humans are exposed from ingestion of water from the Upper Columbia River or Lake Roosevelt and through consumption of fish, aquatic resources, native plants, and agricultural crops.

Environmental effects of slag include both chemical (increased metal loads, potential bioaccumulation, toxicity problems in biota) and physical (scouring of plants and animals

in substrates, severe erosion of fish gills, smothering of habitat) components.

(Paragraph numbers omitted.).

Teck moved to strike or dismiss these claims on the ground that CERCLA imposes no liability when hazardous substances travel through the air and then "into or on any land or water" (as opposed to when hazardous substances are directly deposited into or on land or water and are then emitted into the air). The district court rejected Teck's argument and denied the motion.

One month later, the Ninth Circuit issued *Center for Community Action & Environmental Justice v. BNSF Railway Co.*, 764 F.3d 1019, 1023–24 (9th Cir. 2014), which held that emitting diesel particulate matter into the air and allowing it to be "transported by wind and air currents onto the land and water" did not constitute "disposal" of waste within the meaning of the Resource Conservation and Recovery Act ("RCRA"). Teck filed a motion for reconsideration, arguing that *Center for Community Action* foreclosed Plaintiffs' air pathway claims because CERCLA cross-references RCRA's definition of "disposal." The district court denied the motion on the ground that the actionable CERCLA "disposal" in this case occurred when the hazardous substances emitted by Teck entered the land or water at the UCR Site, not when the substances were initially released into the air. However, recognizing that "[i]n over 30 years of CERCLA jurisprudence, no court has impliedly or expressly addressed the issue of whether aerial emissions leading to disposal of hazardous substances 'into or on any land or water' are actionable under CERCLA," the district court certified the

question for interlocutory appeal.  We granted permission to appeal and now reverse and remand.

## II.  Standard of Review

A district court's denial of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss is reviewed de novo. *Dunn v. Castro*, 621 F.3d 1196, 1198 (9th Cir. 2010). "Similarly, the district court's interpretation of a statute is a question of law which we review de novo." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (en banc) (alteration, emphasis, and internal quotation marks omitted).

## III.    Discussion

### A.  Principles of Statutory Interpretation

Statutory interpretation begins with the text of the statute. Unless a statute provides an explicit definition, we generally give words "their ordinary, contemporary, common meaning." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) (internal quotation marks omitted).  If the meaning of the text is unambiguous, the statute must be enforced according to its terms.  "[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (internal quotation marks omitted).  "Reviewing the whole statutory scheme is particularly important for a law such as CERCLA, which is a complex regulatory statute with 'a web . . . of sections, subsections, definitions, exceptions, defenses, and administrative provisions.'" *Chubb Custom*, 710 F.3d at 958 (quoting *Carson Harbor*, 270 F.3d at 880).

## B.  CERCLA: Statutory Text and Framework

"CERCLA sets forth a comprehensive scheme for the cleanup of hazardous waste sites . . . ."  *Pakootas I*, 452 F.3d at 1072.  The statute has two primary goals: "(1) to ensure the prompt and effective cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances bear the cost of remedying the conditions they created." *Chubb Custom*, 710 F.3d at 968 (alteration omitted) (quoting *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 447 (9th Cir. 2011)).

CERCLA does not set forth its own definition of "disposal," the key word at issue in this case.  Rather, it cross-references RCRA's.  42 U.S.C. § 9601(29) ("The term[] 'disposal' . . . shall have the meaning provided in [42 U.S.C. § 6903].").  RCRA defines "disposal" as

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

*Id.* § 6903(3).

The word "disposal" and derivations thereof ("disposing," "disposed") appear in several places in CERCLA.  In order to prevail in a private action under CERCLA for response costs or natural resource damages, a plaintiff must prove the following elements, among others:

> (1) the site on which the hazardous substances are found is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9);
>
> (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); and
>
> (3) the defendant is within one of the four broad classes of "potentially responsible parties" ("PRPs") listed in 42 U.S.C. § 9607(a)(1)–(4).

*3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1358 (9th Cir. 1990).[4]

A "facility" is defined in relevant part as "any site or area where a hazardous substance has been deposited, stored, *disposed of*, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9) (emphasis added).

---

[4] To obtain response costs, a plaintiff must also show that the release or threatened release of the hazardous substances caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4); *3550 Stevens Creek*, 915 F.2d at 1358. To win natural resource damages, a plaintiff need not incur response costs, but must show that "natural resources within the [plaintiff's] trusteeship . . . have been injured" and "that the injury to natural resources 'resulted from' a release of a hazardous substance." *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1102 (D. Idaho 2003) (footnote omitted). CERCLA also allows recovery of "the costs of any health assessment or health effects study carried out under 42 U.S.C. § 9604(i)," 42 U.S.C. § 9607(a)(4)(D), but there is no such claim in this case.

A "release" is defined as

> any spilling, leaking, pumping, pouring,
> emitting, emptying, discharging, injecting,
> escaping, leaching, dumping, or *disposing* into
> the environment (including the abandonment
> or discarding of barrels, containers, and other
> closed receptacles containing any hazardous
> substance or pollutant or contaminant) . . . .

*Id.* § 9601(22) (emphasis added).

The four PRP classes are:

> (1) the owner and operator of a vessel or a
> facility,
>
> (2) any person who *at the time of disposal* of
> any hazardous substance owned or operated
> any facility at which such hazardous
> substances were *disposed of*,
>
> (3) any person who by contract, agreement, or
> otherwise arranged for *disposal* or treatment,
> or arranged with a transporter for transport for
> *disposal* or treatment, of hazardous substances
> owned or possessed by such person, by any
> other party or entity, at any facility or
> incineration vessel owned or operated by
> another party or entity and containing such
> hazardous substances, and
>
> (4) any person who accepts or accepted any
> hazardous substances for transport to *disposal*

or treatment facilities, incineration vessels or
sites selected by such person . . . .

*Id.* § 9607(a) (emphases added).

CERCLA allows a number of affirmative defenses. Two
of them, the "innocent landowner defense" and the "bona fide
prospective purchaser defense," protect facility owners[5] from
liability if they can prove, *inter alia*, that they did not acquire
the facility until after the "disposal" of hazardous substances
at the facility.[6]

---

[5] There is a circuit split on whether the innocent landowner defense
applies to former as well as current facility owners. *Compare United
States v. CDMG Realty Co.*, 96 F.3d 706, 716 (3d Cir. 1996) (referring to
"[t]he innocent owner defense's apparent limitation to current owners")
*with ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 358 (2d Cir.
1997) (the defense is available to both current and past owners). Our
Circuit has not decided. *Carson Harbor*, 270 F.3d at 883 n.10.

[6] The textual basis for these defenses is somewhat convoluted.
42 U.S.C. § 9607(b)(3) establishes the third-party defense. It allows any
PRP to escape liability if the release or threatened release was (1) "caused
solely by" (2) a third party, (3) the third party is not an employee or agent
of the PRP or in a direct or indirect contractual relationship with the PRP,
(4) the PRP exercised due care with respect to the hazardous substance
and (5) the PRP "took precautions against foreseeable acts or omissions
of any such third party and the consequences that could foreseeably result
from such acts or omissions." In 1986, Congress passed the Superfund
Amendments and Reauthorization Act, which added the so-called
"innocent landowner" defense by defining the previously undefined term
"contractual relationship," Pub. L. No. 99-499, § 101, 100 Stat. 1613,
1616–17. The new definition of "contractual relationship" exempted from
liability a defendant who can prove, *inter alia*, that "the real property on
which the facility concerned is located was acquired by the defendant after
the disposal or placement of the hazardous substance on, in, or at the
facility" and "[a]t the time the defendant acquired the facility the
defendant did not know and had no reason to know that any hazardous

In sum, the word "disposal" appears in the definitions of "facility" and "release," the definitions of three of the four PRP classes, and the innocent landowner and bona fide prospective purchaser defenses.  Our interpretation of "disposal" for purposes of determining whether Teck can be held liable for arranging the disposal of hazardous substances "has ripple effects" throughout the rest of the statute, even though the only provision technically in dispute is § 9607(a)(3). *See Carson Harbor*, 270 F.3d at 880.

## C.  Whether Teck Arranged for "Disposal"

Plaintiffs argue that they have properly alleged the "deposit" of hazardous substances into the land or water at the UCR Site,[7] one of the verbs used to define "disposal." 42 U.S.C. § 6903(3).

Plaintiffs' "aerial deposition" theory appears to depend on Teck allowing hazardous substances to be "deposit[ed]" at the UCR Site by the wind, as opposed to Teck directly depositing

---

substance which is the subject of the release or threatened release was disposed of on, in, or at the facility."  42 U.S.C. § 9601(35)(A)(i).  In 2002, Congress amended CERCLA again.  *See* Small Business Liability Relief and Brownfields Revitalization Act, Pub. L. No. 107-118, 115 Stat. 2356 (2002).  This time, it added a "bona fide prospective purchaser" defense which exempted current landowners from liability if they could show, *inter alia*, that they acquired the land after January 2002 and that "[a]ll disposal of hazardous substances at the facility occurred before the person acquired the facility."  *See id.* sec. 222 (codified at 42 U.S.C. §§ 9601(40), 9607(r)).

[7] Plaintiffs do not argue that Teck "discharge[d], . . . inject[ed], dump[ed], spill[ed], leak[ed], or plac[ed]" hazardous substances into or on any land or water.  We therefore limit our analysis to the term "deposit."

hazardous substances there.**[8]**  The dictionary definitions cited by Plaintiffs all refer to natural forces slowly depositing layers of dirt or mud over time.  For example, American Heritage Dictionary defines "deposit," in relevant part, as "[t]o put or set down; place" or "[t]o lay down or leave behind by a natural process: *layers of sediment that were deposited on the ocean floor; glaciers that deposited their debris as they melted*."  *Deposit*, The American Heritage Dictionary, https://www.ahdictionary.com/ (search for "deposit") (last visited Mar. 24, 2016).  Merriam-Webster defines "deposit" as "to lay down" or "to let fall (as sediment)," as in "layers of mud *deposited* by flood waters." *Deposit*, Merriam-Webster, http://www.merriam-webster.com (search for "deposit") (last visited Mar. 24, 2016).  Oxford Dictionaries defines "deposit" as "(Of water, the wind, or other natural agency) lay down (matter) gradually as a layer or covering," as in "*beds where salt is deposited by the tide*."  *Deposit*, Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/deposit (last visited Mar. 24, 2016).

Plaintiffs' interpretation appears a reasonable enough construction of § 9607(a)(3), and if we were writing on a

---

**[8]** We note that, if the statute imposed liability on someone who "disposed" as opposed to someone who "arranged for disposal," 42 U.S.C. § 9607(a)(3), it would be difficult to fit the fact pattern in this case into the word "deposit."  When the subject depositing something is a person, the action of "depositing" seems to be more discrete and the object being deposited seems to be more concrete and specific, e.g., "Please *deposit* your things in your room . . . ." or "The taxi *deposited* us at the train station."  *Deposit*, Merriam-Webster, http://www.merriam-webster.com (search for "deposit") (last visited Mar. 24, 2016).  The "arranged for disposal" language, though, arguably allows a more indirect form of deposit.

blank slate, we might be persuaded to adopt it.  However, we do not write on a blank slate.  Our en banc court in *Carson Harbor* and a prior panel in *Center for Community Action* earlier interpreted the terms "deposit" and "disposal."  In *Carson Harbor*, the majority held that the term "deposit," as used in CERCLA, "is akin to 'putting down,' or placement" by someone and that "[n]othing in the context of the statute or the term 'disposal' suggests that Congress meant to include chemical or geologic processes or passive migration," i.e., the gradual spread of contaminants without human intervention. 270 F.3d at 879 & n.7.  It reasoned, "where Congress intended such a meaning, it employed specific terminology, such as 'leaching.'"  *Id.* at 879 n.7.

*Center for Community Action*, which involved essentially the same facts as this case, *see* 764 F.3d at 1021 (alleging emission of hazardous substances into the air, some of which was directly inhaled before they touched the ground, and some of which touched the ground before being re-entrained into the air by air currents),  interpreted 42 U.S.C. § 6903(3) as requiring solid or hazardous waste to "*first* [be] placed 'into or on any land or water' and [] *thereafter* [be] 'emitted into the air.'" *Id.* at 1024.  It observed that Congress knew how to use the word "emit" when it wanted to.  *Id.* at 1024–25.  The "disposal" definition itself uses the term "emitted" in the second half of the sentence, but not the first. 42 U.S.C. § 6903(3). RCRA's definition of "release" uses the term "emitting" along with "disposing."  *Id.* § 6991(8). CERCLA's definition of "release" is similar.  *Id.* § 9601(22). These suggest that Congress did not imagine "emission" as "disposal," although it did allow that hazardous substances could escape into the environment through emission after they were disposed of, such as if a container of gas began to leak.

Plaintiffs have offered no persuasive argument to distinguish either *Carson Harbor* or *Center for Community Action*. We agree with Plaintiffs that *Center for Community Action*'s interpretation of "disposal" for RCRA purposes does not absolutely foreclose a different interpretation of "disposal" for CERCLA purposes,[9] but the reasoning behind

---

[9] The Supreme Court teaches that, even when the same word is used in different provisions of the same statute, the word does not necessarily have to be interpreted identically. *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 575–76 (2007). Rather, "the presumption of consistent usage 'readily yields' to context, and a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (quoting *Duke Energy Corp.*, 549 U.S. at 574). Here, where the same word is used in different statutes employing different strategies for protecting the environment, "[c]ontext [also] counts." *Duke Energy Corp.*, 549 U.S. at 576. As the Supreme Court and this court have made clear, CERCLA and RCRA both address hazardous waste disposal but in different ways. RCRA regulates the generation of hazardous waste primarily by requiring generators to comply with handling, record-keeping, storage, and monitoring requirements. *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 332 (1994). CERCLA, on the other hand, "is not a regulatory statute." *Pakootas I*, 452 F.3d at 1073. Rather, it is concerned with making waste generators pay for cleanup, even when the actual generation of waste is otherwise legal under RCRA or other statutes. *See id.* at 1078. The statutes provide different remedies. Both RCRA and CERCLA can be used to compel prospective cleanup; however, only CERCLA allows recovery of cleanup costs already incurred, *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484–85 (1996), a unique mechanism that facilitates prompt cleanup by the government or any of several PRPs, with cost allocation issues to be resolved later. Also, CERCLA, but not RCRA, allows federal and state governments and tribes to be compensated for the lost use value of natural resources damaged by the contamination and the cost of assessing damages. *See* 42 U.S.C. § 6972(a); *Meghrig*, 516 U.S. at 484–85; *Abreu v. United States*, 468 F.3d 20, 32 (1st Cir. 2006) (RCRA does not authorize suits for compensatory damages). Since liability under these two statutes is not co-terminous, we hesitate to assume that *Center*

*Center for Community Action*'s textual analysis is persuasive. Similarly, *Carson Harbor* addressed former owner liability under § 9607(a)(2) and not arranger liability under § 9607(a)(3), but Plaintiffs offer no compelling reason to interpret "deposit" differently for purposes of those two subsections of CERCLA.

If interpreting "deposit" as not including Teck's conduct "would thwart the overall statutory scheme or lead to an absurd result," *Chubb Custom*, 710 F.3d at 958, in some way not considered by those cases, there might be some basis for deviating from them. However, the only inconsistencies with the statutory scheme that Plaintiffs have pointed out is that CERCLA has a broad remedial purpose and that Teck's interpretation might render CERCLA's "federally permitted release" exception surplusage. With regard to the first argument, it is axiomatic that CERCLA should be construed liberally to effectuate its remedial purpose, but statutory interpretation must still be "grounded in the statute's text and structure." *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2185 (2014). As for the second argument, the "federally permitted release" exception, *see* 42 U.S.C. §§ 9601(10)(H), 9607(j), and the legislative history behind it[10] hint that Congress might

---

*for Community Action*'s construction of "disposal" in the RCRA context controls the construction of "disposal" in the CERCLA context in all cases, although we see no compelling reason to override the presumption of consistent usage in this case.

[10] Senator Randolph, one of the key players who introduced the final version of the bill that became CERCLA, stated on the Senate floor:

> Congress has never said or suggested that a Federal permit amounts to a license to create threats to public health or the environment with legal immunity.

have intended CERCLA to apply to emissions of hazardous substances up to the point where it ran into the Clean Air Act. However, the federally permitted "release" exception could also be read as addressing emissions as releases and not emissions as a form of disposal.  In contrast, Plaintiffs' interpretation of "deposit" seems to be inconsistent with the rest of CERCLA in the same way identified as problematic by *Carson Harbor*—if "aerial depositions" are accepted as "disposals," "disposal" would be a never-ending process, essentially eliminating the innocent landowner defense. 270 F.3d at 882–83.

Given that the language of CERCLA is not a model of precise crafting, *id.* at 883 ("[N]either a logician nor a grammarian will find comfort in the world of CERCLA."), we ordinarily would refer to legislative history to help us interpret the statutory language.  *Tides v. The Boeing Co.*,

---

> However, in view of the large sums of money spent to comply with specific regulatory programs, liability for federally permitted releases ought to be determined based on the facts of each individual case.  Therefore, the Stafford-Randolph substitute [bill] authorizes response to federally permitted releases, but requires costs to be assessed against the permit holder under the liability provisions of other laws, not this bill.

> . . . .

> While the exemptions from liability for federally permitted releases are provided to give regulated parties clarity in their legal duties and responsibilities, these exemptions are not to operate to create gaps in actions necessary to protect the public or the environment.

126 Cong. Rec. 30,897, 30,932–33 (Nov. 24, 1980) (statement of Sen. Randolph).

644 F.3d 809, 814 (9th Cir. 2011) ("If the statutory language is ambiguous . . . we may refer to legislative history to discern congressional intent."). However, the legislative history of CERCLA is not particularly helpful in this case. Although that history makes clear that CERCLA was intended to be construed expansively, *see United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1240–41 (9th Cir. 2005), it sheds no light on the question before us because Congress did not appear to consider a fact pattern like this one.[11]

Nor have we been presented with an agency interpretation of "deposit" to which we might owe *Chevron* deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–86 (2005) (*Chevron* deference may be due to a reasonable agency interpretation of an ambiguous statute even if it conflicts with a prior circuit court interpretation). The EPA does not appear to have any regulations or sub-regulatory guidance interpreting "disposal" or "deposit."[12]

---

[11] Plaintiffs offer a couple snippets of legislative history purportedly showing Congress's intention for CERCLA to cover emissions of hazardous substances. 126 Cong. Rec. 30,897, 30,941 (Nov. 24, 1980) (statement of Sen. Mitchell); *id.* at 30,948 (statement of Sen. Cohen). However, as Teck points out, those snippets seem to refer to emissions of hazardous substances released from facilities, not emissions as a form of disposal.

[12] Neither Plaintiffs nor amicus curiae the United States argued that deference was due in their briefs. After oral argument, the United States filed a Federal Rule of Appellate Procedure 28(j) letter of supplemental authorities arguing that *Skidmore* deference may be due to the EPA's construction of "disposal" as encompassing "aerial depositions" in previous consent orders involving factories that, like Teck, emitted hazardous substances through their smokestacks which contaminated a large area of land around the factory. *See The Wilderness Society v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1068–69 (9th Cir. 2003) (en banc)

Neither has intervening en banc or Supreme Court authority cast the reasoning behind *Center for Community Action* or *Carson Harbor* in doubt. In this situation, "[a]n appellate panel simply cannot modify an En banc decision," *Osband v. Woodford*, 290 F.3d 1036, 1043 (9th Cir. 2002) (quoting *Ewing v. Williams*, 596 F.2d 391, 397 (9th Cir. 1979)), and there is no compelling reason to abandon a prior panel's construction, *see Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (a three-judge panel ordinarily cannot overrule a prior panel's holding unless its reasoning is inconsistent with the reasoning behind an intervening decision by a court of last resort).

## IV.    Conclusion

While Plaintiffs present an arguably plausible construction of "deposit" and "disposal," *Carson Harbor* compels us to hold otherwise, and while *Center for Community Action* does not totally foreclose Plaintiffs'

---

(opinion letters regarding a specific case and not intended to have the general force of law are not due *Chevron* deference, but may be due *Skidmore* deference, depending on their thoroughness, rational validity, consistency with prior and subsequent interpretations, the "expertness" of the agency's interpretation, and the care and formality used in reaching its conclusion). Arguments raised for the first time in 28(j) letters are ordinarily considered waived. *United States v. McEnry*, 659 F.3d 893, 902 (9th Cir. 2011). The merit of that principle is evident here, where, even if *Skidmore* deference was due to the EPA's consent orders, we would have to determine whether an agency interpretation that is due *Skidmore* deference but not *Chevron* deference can trump a previous judicial interpretation, a question left open after *Brand X*. J. Lyn Entrikin Goering, *Tailoring Deference to Variety with a Wink and a Nod to* Chevron*: The Roberts Court and the Amorphous Doctrine of Judicial Review of Agency Interpretations of Law*, 36 J. Legis. 18, 64 (2010). We decline to reach such a complex issue on less than full briefing.

interpretation of CERCLA, its textual analysis of 42 U.S.C. § 6903(3) is persuasive.  Thus, we reverse the district court's orders denying Teck's motion to strike and/or dismiss and motion for reconsideration, and remand for the processing of Plaintiffs' remaining claims.

**REVERSED AND REMANDED.**